AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| | **LODGED**<br>CLERK, U.S. DISTRICT COURT<br>8/10/2022<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: ___ ed ___ DEPUTY |

UNITED STATES OF AMERICA,

v.

ANTONIO AVINA,

Defendant.

**FILED**
CLERK, U.S. DISTRICT COURT

8/10/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ clee _____ DEPUTY

Case No.   2:22-mj-03141-DUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of July 20, 2022, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/*
*Complainant's signature*

Joseph Garcia, Special Agent, HSI
*Printed name and title*

Attested to by the applicant in accordance with the
requirements of Fed. R. Crim. P. 4.1 by telephone
~~Sworn to before me and signed in my presence.~~

Date:      August 10, 2022

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Steve Kim, U.S. Magistrate Judge
*Printed name and title*

AUSA: Morgan J. Cohen

## <u>AFFIDAVIT</u>

I, Joseph Garcia, being duly sworn, declare and state as follows:

### I. <u>PURPOSE OF AFFIDAVIT</u>

1. This affidavit is made in support of a criminal complaint and arrest warrant against Antonio Avina ("AVINA") for a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm.

2. This affidavit is also made in support of an application for a warrant to search the following digital device in the custody of Homeland Security Investigations ("HSI") in Los Angeles, California, as described more fully in Attachment A:

    a. One blue Motorola moto g cellphone with a cracked screen (the "SUBJECT DEVICE").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Section 922(g) (Felon in Possession of a Firearm) (the "Subject Offense"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth

all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only and all dates are approximate.

## II. <u>BACKGROUND OF AFFIANT</u>

5. I am a Special Agent with HSI within the U.S. Department of Homeland Security, Immigration and Customs Enforcement, and have been so employed since 2018. Prior to becoming a Special Agent with HSI, I was employed as a United States Border Patrol Agent and Supervisor with Customs and Border Protection for 10 years.

6. I am currently assigned to the HSI Los Angeles Gang Investigations Group, which investigates criminal gang activity. I am also a member of the Los Angeles Metropolitan Task Force on Violent Gangs, a multi-agency federal, state, and local gang task force. Both groups investigate violent street gangs involved in the possession with intent to distribute and the distribution of controlled substances, as well as conspiracy to do the same, in violation of 21 U.S.C. §§ 841(a)(1) and 846; firearms offenses, in violation of 18 U.S.C. §§ 922 and 924, and 924(c); and racketeering, in violation of 18 U.S.C. § 1962.

7. As a Special Agent with HSI, I have participated in investigations of various crimes, including assault, murder, gang activity, and firearms and narcotics trafficking. For the last two years, I have primarily investigated violent street gangs involved in narcotics distribution crimes, gun crimes, racketeering crimes, and criminal conspiracies. I have also

investigated the Mexican Mafia ("EME") prison gang -- its crimes, its members, and its associates -- and have interviewed EME-affiliated gang members regarding the organization's structure, rules, goals, and activities.

8.    Throughout my investigations, I have used a variety of law enforcement techniques, including physical and electronic surveillance, controlled drug and gun buys, interviews of witnesses and subjects, use of confidential informants, and execution of search warrants.  I have also been the affiant in Title III applications, monitored Title III communications, and conducted surveillance in conjunction with wiretap investigations.

9.    As a Special Agent with HSI, I have received training, both formal and informal, in investigating federal crimes, including federal narcotic, conspiracy, and racketeering crimes.  Throughout my enforcement career in HSI LA Gangs, I have discussed gangs, gang culture, and gang operations with both experienced law enforcement officers and knowledgeable confidential sources.

10.    Through my training, experience, and interaction with more experienced federal and state law enforcement officers, and other investigators, I have become familiar with the methods used by drug traffickers to avoid detection by law enforcement, including the use of prepaid cellular telephones and phones subscribed to third parties, counter-surveillance techniques, coded and ambiguous language, multiple vehicles without license plates, and false identities.  I have become familiar with the

methods, language, structures, and criminal activities of street gangs and transnational gangs operating within and outside of this judicial district.

11.  I have also become familiar with the efforts of individuals engaged in the importation, smuggling, manufacturing, distribution, and sale of firearms to avoid detection and apprehension by law enforcement officers.  I know that in order to do this effectively, these persons maintain continued access to telephone communication, including both voice and text.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

12.  On July 20, 2022, Los Angeles Police Department ("LAPD") officers responded to a potential robbery at a flower shop in the Flower District of Los Angeles.  The victim stated that a man, later identified as AVINA, entered her store, demanded money from her, threatened to shoot her, and punched her in the chest.  The victim further stated that she saw that the man had a gun on him, but that he did not brandish the gun.  AVINA was present at the scene when the officers arrived, and the victim identified AVINA as the man who hit and threatened her.  The officers detained AVINA, and as they were attempting to handcuff him, AVINA stated that he had a gun on him.  The officers discovered a loaded handgun in AVINA's waist-area.  The officers subsequently discovered the SUBJECT DEVICE in AVINA's pocket.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

13.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    AVINA Punched and Threatened to Shoot Victim G.F.**

14.  Based on my review of the LAPD report and conversations with LAPD officers, I know that on July 20, 2022, at approximately 3:40 p.m., LAPD received a call regarding a potential robbery in the area of 8th Street and Crocker Street in the Flower District of Los Angeles.  LAPD officers N. Torres and E. Rodriguez arrived at the scene and spoke with G.F., the victim who had called the police.

15.  Based on my training and experience, I know that many businesses in the Flower District have small, unlicensed gambling operations in their stores, that street gangs in the area "tax" those businesses, and that such gangs will threaten or engage in violence if the business do not pay the "tax."

16.  Based on my review of the LAPD police report and the LAPD officers' body camera footage, I know that G.F. stated the following:

        a.    She was working in her flower shop behind the counter when two men walked in.

        b.    G.F. said that one of the man, later identified as AVINA, stated to G.F. that slot machines were illegal and demanded that G.F. give him money.

      c.    AVINA walked behind the counter, where G.F. was standing.  G.F. observed that AVINA had a gun in his waistband, and feared for her life.

      d.    AVINA threatened to shoot G.F. unless she gave him money or removed the slot machines from her store.  AVINA did not brandish the gun.

      e.    G.F. attempted to film AVINA with her cellphone, but AVINA slapped the phone out of her hand.

      f.    As G.F. attempted to push AVINA and the other man out of her store, AVINA punched her in the left side of her chest.

17.  Based on my review of the LAPD police report and the LAPD officers' body camera footage, I know that when LAPD officers Torres and Rodriguez arrived on the scene, G.F. identified AVINA, who was still present, as the man who had hit and threatened her.

**B.  LAPD Found a Loaded Gun and the SUBJECT DEVICE on AVINA's Person**

18.  Based on my review of the LAPD police report and the LAPD officers' body camera footage, I know that after G.F. identified AVINA, officers Torres and Rodriguez attempted to detain and handcuff him.  AVINA can be seen on the officers' body camera footage struggling -- specifically, not standing still or complying with the officers' commands to "relax" -- with the officers as they attempted to place him in handcuffs. As the officers were attempting to handcuff AVINA, AVINA can be heard stating: "get the gun here."  Immediately thereafter,

Officer Rodriguez removed a black pistol with a white handle from AVINA's waist-area (the "handgun"). The handgun was loaded with 14 rounds of ammunition.

19. The LAPD officers placed AVINA under arrest for robbery, in violation of California Penal Code Section 211. The LAPD officers searched AVINA's person incident to that arrest and discovered the SUBJECT DEVICE in the right back-pocket of AVINA's pants.

**C. Criminal History**

20. On August 8, 2022, I reviewed certified conviction documents for AVINA and learned that he has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

a. On or about May 26, 2004, grand theft of an automobile, in violation of California Penal Code Section 487(d)(1), in the Superior Court for the State of California, County of Los Angeles, Case Number BA263574;

b. On or about September 17, 2008, taking a vehicle without permission, in violation of California Penal Code Section 10851(a), in the Superior Court for the State of California, County of Los Angeles, Case Number VA107176;

c. On or about June 28, 2010, felon in possession of a firearm, in violation of California Penal Code Section 12021(a)(1), in the Superior Court for the State of California, County of Los Angeles, Case Number VA115551; and

d. On or about April 2, 2012, robbery, in violation of California Penal Code Section 211, in the Superior Court for

the State of California, County of Los Angeles, Case Number
VA120781.

      **D.   Interstate Nexus**

    21.  On August 10, 2022, an ATF Interstate Nexus Expert
examined the handgun and ammunition and confirmed that the
handgun and ammunition were manufactured outside of the State of
California.  Because the handgun and ammunition were found in
California, I believe that they have traveled in and affected
interstate commerce.

        **V.  <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>**

    22.  From my training, personal experience, and the
collective experiences related to me by other law enforcement
officers who conduct who conduct firearms investigations, I am
aware of the following:

        a.   Persons who possess, purchase, or sell firearms
generally maintain records of their firearm transactions as
items of value and usually keep them in their residence, or in
places that are readily accessible, and under their physical
control, such in their digital devices.  It has been my
experience that prohibited individuals who own firearms
illegally will keep the contact information of the individual
who is supplying firearms to prohibited individuals or other
individuals involved in criminal activities for future purchases
or referrals.  Such information is also kept on digital devices.

        b.   Many people also keep mementos of their firearms,
including digital photographs or recordings of themselves
possessing or using firearms on their digital devices.  These

photographs and recordings are often shared via social media, text messages, and over text messaging applications.

        c.  Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

23.  As used herein, the term "digital device" includes the SUBJECT DEVICE.

24.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

        a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have

been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

       b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

       c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain

software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

25.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

        a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

        b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

26.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following,

which I know from my training, experience, and review of publicly available materials:

      a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

      c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress AVINA's thumb- and/or fingers on the

device(s); and (2) hold the device(s) in front of AVINA's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

27. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. <u>CONCLUSION</u>

28. For all of the reasons described above, there is probable cause to believe that AVINA has committed a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this <u>10th</u> day of
August, 2022.

_____
HONORABLE STEVE KIM
UNITED STATES MAGISTRATE JUDGE